# CHARLESTON

Wheeling & Elm Grove R. R. Co. v. The Town of Triadelphia, et al.

Submitted September 14, 1905.    Decided December 12, 1905.

1.  Street Railroads—*Municipal Grant.*
    An ordinance, passed by the council of a town, granting to a street railway company the right to lay its track and operate its railway in the streets of the town, and accepted by the railway company, constitutes a contract between the town and such company, vesting title to such right or easement in it, unless the ordinance contains conditions precedent, compliance with which is requisite to the vesting of title.    (p. 510.)

2.  Street Railroads—*Municipal Grant—Forfeiture of Right.*
    Such right may be forfeited and lost by failure to comply with subsequent conditions, and, if the ordinance expressly provides for forfeiture as the penalty of non-compliance with conditions specified in it, substantial performance of the contract as a whole constitutes no answer to a proceeding to forfeit for failure to comply with such conditions, however slight their relative importance may be.    The question of materiality is, in such case, withdrawn from the courts by the stipulations of the contract.    (p. 510.)

3.  Street Railroads — *Municipal Grant— Conditions — Non-Performance.*
    A street railway license or privilege in a street may be forfeited for failure to lay planks of prescribed dimensions along the rails of its track in front of improved property, if the ordinance expressly gives the right to forfeit it for such cause.    (p. 511.)

4.  Equity—*Relief against Forfeiture.*
    Equity will relieve from forfeitures for non-performance of covenants other than those for the payment of money, arising out of accident, mistake or surprise, in the absence of willful and deliberate refusal to perform, when no pecuniary injury has resulted to the covenantee and the wrong done is easily remediable; but such power of relief is discretionary and will not be exercised unless the delinquent covenantor is able and willing to immediately perform the covenant.    (p. 516.)

5.  Equity—*Enforcement of Forfeiture.*
    Equity will not permit the enforcement of a forfeiture in an inequitable and oppressive manner, nor a perversion thereof to purposes other than those for which the power of forfeiture has been reserved.    (p. 514.)

6. EQUITY—*Oppressive Conduct.*

In the exercise of such power, under an ordinance of a municipal corporation, prescribing notice and specification of cause as a necessary preliminary step, the officers of such corporation must deal fairly, openly and frankly with the party whose rights they attempt to take away and abstain from such conduct as will work a surprise upon him   Their conduct is governed by substantially the same rules and principles as apply to proceedings by private persons under similar circumstances.   In order to be inequitable and oppressive, their conduct need not be actually fraudulent.   If in equity and conscience, it is oppressive or lacking in fairness, equity will relieve, however honest and sincere the parties attempting to forfeit may have been.   (p. 515.)

7. APPEAL—*Review—Discretion of Court.*

The discretion of the court in such case is a sound legal discretion, subject to review, and the appellate court will reverse the action of the trial court, when, in its opinion, relief has been improperly denied.   (p. 518.)

8. STREET RAILROADS—*Use of Streets—Forfeiture—Relief.*

A declaration of forfeiture of a street railway privilege in a street by the council of a town, effected by repeal of the ordinance by which the privilege was granted, pursuant to a reservation of power so to do, for cause and after notice, has not the force and effect of a judicial determination of the existence of cause for forfeiture and does not preclude a resort to the courts by the railway company for vindication of its rights.   After such repeal, pursuant to notice, the railway company may, by injunction, prevent the town authorities from removing or disturbing its track, if no cause of forfeiture existed or the circumstances shown are such as to call for the exercise of equity jurisdiction to relieve from forfeiture.   In so far as the decision in *Town of Davis* v. *Davis*, 40 W. Va. 464, imports the contrary of the forgoing proposition, it is re-examined and disapproved.   (p. 518.)

9. MUNICIPAL CORPORATIONS—*Privileges in Highways—Police Power.*

The action of municipal authorities in granting and revoking privileges and licenses in highways, is the exercise of delegated police power, and is not judicial in character.   (p. 519.)

10. CERTIORARI—*Review.*

Only judicial action is reviewable by the writ of *certiorari* under sections 2 and 3 of chapter 110 of the Code of 1899.   The scope of the writ is not altered by the statute in respect to the nature of the proceedings for the review of which it may be had.   In this respect it remains as it was by the common law.   (p. 499.)

11. STREET RAILROADS—*Construction — Consent of Municipal Authority.*

Consent of the Board of Commissioners of Ohio county to the operation of a street railway on and over the Cumberland Road in

said county of Ohio does not confer authority upon the railway company, holding such permit, to construct and operate its railway on and over such portion of said road as lies within the limits of the town of Triadelphia in said county, without the consent of the authorities of said town. (p. 496.)

Appeal from Circuit Court, Ohio County.

Bill by the Wheeling & Elm Grove Railroad Company against the town of Triadelphia and others. Decree for defendants, and plaintiff appeals.

*Reversed.*

Rehearing denied January 9, 1906.

HENRY M. RUSSELL, and HOWARD & HANDLAN, for appellant.

ALFRED CALDWELL and NELSON C. HUBBARD, for appellees.

POFFENBARGER, JUDGE:

The council of the town of Triadelphia in Ohio county having repealed the ordinance under which the Wheeling and Elm Grove Railroad Company had been operating its street railway in said town, and caused a part of its track to be taken up, said railroad company obtained a temporary injunction, inhibiting the town, its officers and agents from interfering with its road. Thereupon the town answered the bill, alleging forfeiture of the privileges granted by the ordinance, because of failure and refusal to observe and perform conditions, and praying, by way of affirmative relief, that the railroad company be enjoined and restrained from further operating its road in said town and compelled to remove from the streets thereof its poles, wires, rails, ties, &c., restore the street and a certain bridge, mentioned in the bill, to the condition in which they were before the construction of the road, unless the consent of the town to the further occupation and use of the street for the purpose aforesaid should be obtained. On the hearing, the injunction was dissolved and the cross-relief asked for by the town granted. From this decree said company has appealed.

The ordinance was passed on the 31st day of March, 1896, granting to the Wheeling Suburban Railway Company, its successors and assigns, the privileges now in question, and

that company subsequently assigned the same to said Wheeling and Elm Grove Railway Company. Under it, the road was constructed within the time required. The forfeiture is not for non-user of the franchise or privilege, but for failure to comply with certain conditions imposed by section 4 of the ordinance in the following clauses thereof: "Said railway company shall so construct its tracks upon the roads or streets hereinbefore mentioned that at any place any of its tracks may cross any road or street within said town, the said railway company shall at every such place lay its track or tracks on a level with the surface or plane of said road or street at the place of such crossing and shall pave with white oak planks not less than two inches thick between all its rails crossing such road or street and shall at all times hereafter keep and maintain the said paving or planking in good order and repair to the satisfaction of the council of said town. Said company shall also lay and maintain a white oak plank two inches thick and eight inches wide on each side of each rail along its track in front of all improved property."

To enforce compliance with these conditions and others inserted in the ordinance, section 15 of that instrument provides as follows: "Should the Wheeling Suburban Railway Company fail to fulfill and perform the conditions of this ordinance or comply with the requirements thereof upon them, or do those things they are by this ordinance prohibited from doing, the said town may give said Wheeling Suburban Railway Company notice of its intention to repeal this ordinance and revoke and annul all the rights, powers and privileges by this ordinance given by said town to said Wheeling Suburban Railway Company, and stating in such notice in what respect said Wheeling Suburban Railway Company have failed to fulfill and perform the conditions of this ordinance or to comply with the requirements thereof upon them, or wherein they have done any of those things they are by this ordinance prohibited. from doing. At any time after three months from the service of such notice upon the president or secretary of said Wheeling Suburban Railway Company, the council of said town may repeal this ordinance and revoke and annul the rights, powers and privileges by this ordinance given by said town to said Wheeling

Suburban Railway Company; Provided, however, That if the said Wheeling Suburban Railway Company before such repeal and revocation and annulling, shall fulfill and perform the condition or conditions of this ordinance said notice alleges they have failed to fulfill and perform, and shall comply with the requirement or requirements of this ordinance said notice alleges they have failed to comply with and shall cease at once on receipt of said notice to do any of those things that they are prohibited from doing by, this ordinance which said notice states they have been doing, said council shall not have the power to repeal and revoke and annul the rights, powers and privileges thereby given by said town to said Wheeling Suburban Railway Company."

Notice dated August 28th, 1901, specifying, as breaches of conditions, elevation of the tracks above the level of the streets at the crossings of Monroe Street and Clay Street, failure in part to pave the crossing at Clay Street, and failure to lay planks along the rails in front of lots 24 to 33, inclusive, except a short strip at the corner of lot 30, was served upon the railway company. Just a few days before the expiration of three months from the date of service of said notice, said company caused its track to be lowered at the crossings and some plank to be put down at the places specified in the notice, but the plank pavement at the street crossing did not extend entirely across the street and the planks laid along the tracks in front of improved property were not of the width required by the ordinance. Many of them were only five inches wide and, in one place, for a distance of about ninety feet none at all were put down, and the crossing at Monroe Street was left too high by about five inches. On the 7th day of December, 1901, more than three months after the date of the service of the notice, the council of the town repealed the ordinance, reciting in the repealing ordinance the giving of the notice, and non-compliance with its requirements. The failure to comply strictly with the requirements of the ordinance is not denied by the railway company, but it claims to have substantially complied with them, and, also that, prior to the repealing of the ordinance, its agents applied to officials of the town to know whether there was any objection to the manner in which the work had been done and expressed a willingness to remedy any defects in it

which might be suggested, and no objection was made.
But this seems to have occurred after the repeal of the ordi-
nance. The railway company's own witness says it was after-
ward.

·· In addition to its defense of substantial compliance, the
railway company relies upon certain ordinances adopted by
the commissioners of Ohio county, granting to it the privi-
lege of operating its railway on and over certain portions of
what is known as the Cumberland Road, including that
portion thereof which runs through the town of Triadelphia,
and on which said railway is located through said town. This
road was originally constructed and owned by the govern-
ment of the United States. In 1835, the government ceded
to the several states through which said road was located, the
care and control of the portions thereof lying respectively
within said states, reserving to itself certain rights in them.
By this compact it relieved itself of the burden of maintain-
ing said road and cast it upon the states, but it retained
the right to use the same free of charge for any governmen-
tal purpose. *Seabright* v. *Stokes,* 3 How. U. S. 151; *Neil*
v. *Ohio,* 3 How. U. S. 720; *Achison* v. *Huddleson,* 12 How.
U. S. 293. Upon the formation of the State of West Vir-
ginia, that portion of said road lying within this state passed
under its control, and, by statute, the management thereof
was entrusted to the board of public works of the state. By
an act of the legislature, passed on the 13th day of February,
1890, the care and control of so much of said road as lies
within the county of Ohio, together with all the rights, powers
and duties in relation thereto, belonging to the board of
public works of this state under existing laws, including
power to collect tolls on said road, was committed to the
Board of Commissioners of said county, as soon as said board
should pass an ordinance agreeing to accept the trust. Soon
afterwards, such ordinance was passed. It is contended now
that the town of Triadelphia has no control of that part of
said road which lies within its limits and that the railway
company is entitled to the use and occupation thereof, for
the purposes of its road, under the ordinances passed by said
board of commissioners. On the other hand, it is urged that
the act of the legislature of Virginia, passed on the 4th day
of February, 1840, incorporating the town of Triadelphia,

lying on both sides of said road, and conferring upon it, among other things, the power "to regulate and graduate the streets and alleys, and to pave the same if deemed necessary," vested in said town all the right and title to, and power over, so much of said road as lies within its territory, that the state of Virginia then had.    Counsel for the appellees rely also upon section 5 of Article XI of the Constitution of this State which provides that "No law shall be passed by the legislature granting the right to construct and operate a street railroad within any city, town, or incorporated village, without requiring the consent of the local authorities having the control of the street and highway proposed to be occupied by such street railroad."

The status of so much of the national road as lies within the territory of the town of Triadelphia depends upon the the statutory provisions.    Chapter 56 of the Code, concerning the board of public works and tolls on the Cumberland road and other turnpikes, provides for the maintenance of said road and turnpikes, by means of the exaction of tolls and this, as to said Cumberland road, was done by the board of public works of the state until its care and control were transferred to Ohio county by the act hereinbefore mentioned.    Section 21 of chapter 39 of the Code provides that the interest which belonged to the state on the first day of July, one thousand eight hundred and sixty-eight, in any road or bridge or public landing lying wholly or in part within the limits of any county is transferred to and shall continue vested in such county, so far as such road, bridge or public landing is within said county.    But the Cumberland road is expressly excepted from the operation of said section.    Section 31 of chapter 43 of the Code of 1899 says: "The roads, bridges and public landings transferred by the State to the several counties in which they are situated shall hereafter he regarded as county roads, bridges and landings."    Section 28 of chapter 47 relating to cities, towns or villages, says:    "The council of such city, town or village shall have power therein to lay off, vacate, close, open, alter, curb, pave and keep in good repair, roads, streets, alleys, sidewalks, crosswalks, drains and gutters, for the use of the public, or any of the citizens thereof, and to improve and light the same, and have them kept free from obstructions on or

over them." Section 33 of chapter 43 of the Code of 1899, provides that no road or landing shall be established by the county court of a county upon or through any lot in any incorporated village, town or city without the consent of the council thereof.

Aside from the question of title to the fee in public roads lying within incorporated cities and towns, courts everywhere incline to the view that such corporations have certain rights and powers respecting such public roads. When there are no express statutory provisions limiting the powers of the county authorities over such portions of the public roads, and the general statute or the charters of cities and towns confer power to lay out, open and regulate streets, alleys and walks, portions of the road lying within the city or town are generally held to be under the control of the authorities thereof so far as to enable them to keep the same free from obstruction and in good condition and order by improving them. *State* v. *City of New Brunswick*, 30 N. J. L. 395; *Quinn* v. *Patterson*, 27 N. J. L. 35; *State* v. *Passaic Turnpike Co.*, 27 N. J. L. 217; *State* v. *Jersey City*, 26 N. J. L. 444. These are cases of turnpikes and plank roads owned by private corporations. Dillon on Municipal Corporations (4 Ed.) Par. 676, says: "Throughout the United States, township, county or other local authorities have the general control and supervision over the ordinary public highway, while in incorporated towns and cities this power, as respects streets, is usually conferred upon the corporate authorities. When the jurisdiction and power in the one is excluded by the charters of the other, has given rise to nice and difficult questions of construction, depending upon the supposed intention of the legislature, to be gathered from the whole course of legislation on the subject in the particular state, and with reference to the particular municipality." At section 677, the same work says: "So, by statute in Texas, the counties had a general authority to keep in repair the public highways therein, and an incorporated town, by its charter, had the right to improve its streets and alleys; and the question arose, whether the county or town authorities had power to keep in repair streets or highways within the corporate limits of the town. The court, to prevent conflict of jurisdiction, held that the town had exclusive control of the streets

and highways therein.   So it is held in Indiana, that the general statutes of the State in relation to 'public Highways' do not apply to the *streets* and *alleys* of an incorporated town or city."   In *Norwich* v.  *Story*, 25 Conn. 44, such provision in the charter of a city, read in connection with the general laws conferring powers upon the county authorities, were held to give concurrent jurisdiction over the highway within the city to city and county authorities.

The status of the Cumberland road seems to be somewhat different from that of the ordinary county road.   The legislature has dealt with it in a manner different from that in which it has dealt with other roads.   Whether the law contemplated its maintainance throughout from tolls, until its transfer to the authorities of Ohio county, is not clearly indicated.   It would seem, however, that in order to effectuate the purpose of its maintenance, the legislature must have necessarily retained the power of maintenance through the corporations situated on it.   No express authority is conferred upon them to close or alter it, nor is any duty laid upon them to maintain it according to any particular standard. Hence, if the state did not retain the power to keep it up, the portions lying within the town might have become, or might yet become, so dilapidated and out of repair as to render the whole road practically useless.   Before the cession of the road to the state, the government expended upon it large amounts of money, and stipulated for the use of the road for governmental purposes, without liability for future expenses or cost in keeping it in repair.   By allowing the road or any part of it to fall into decay, the state might become guilty of recreancy to the trust confided in it by the national government.   On the other hand, as the towns have the power to make, construct and keep in repair their roads and streets, it seems reasonable to say they might improve, repair and maintain such portions of said road as lie within their territories.   This is not at all inconsistent with the rights of the state or county.   Though not having full and complete control so as to enable them to impair the efficiency of the road as a state road, they might well have the right and power, consistently with the interests of the state, to aid in keeping it in repair and to add to the work done by the state such additional work and expense as their authori-

ties might deem expedient in order 'to put such portions of it in a higher and better state of repair and condition than other portions thereof.   As to additional burdens upon the road, a reasonable view would be that the state, without the consent of the authorities of the town, would have no right or power to place upon that portion of it lying within the town anything in the nature of an obstruction or additional burden. The town, when incorporated, accepted the road as a part of its territory without any such burden, and the constitution withholds from the legislature power to grant the right to construct a street railroad within any city or incorporated village, without the consent of its authorities. And the state may have the power to say, on the other hand, that the town shall not impair the efficiency and usefulness of its road by authorizing the construction of a street railway upon it. The statutes and constitutional provisions must be harmonized, if possible, so that all may have effect.   By giving this community of interest in so much of the road as lies within the town, repugnancy is avoided, and the rights of both the state and the town protected.   Part of the Cumberland road was taken into the town by express legislative authority. The town accepted it as a part of its territory in its then condition.   No change occurred in it prior to the adoption of the present constitution, and that instrument denies to the legislature the power to authorize the invasion of any town by a street 'railroad without its consent. As the legislature has no power to do this in any case, it could not authorize the board of commissioners of Ohio county to grant such a privilege within the town.   In view of this situation, the respective rights of the town and of the state or Ohio county, the Wheeling Suburban Railway Company took the precaution to obtain grants of privileges in that part of the road lying within the town of Triadelphia from both the board of commissioners and the council of said town. Whether, as to that portion of the road, it was necessary to have authority from said board of commissioners, it is not necessary to decide, but we are clearly of the opinion that it was necessary to have authority to use it from the council of the town of Triadelphia.

The grant from the town of permission to use said Cumberland road and continuance thereof being conditions pre-

cedent to its rights to use it, two questions arise.   First, Assuming that there has been no forfeiture of the franchise granted, has the railway company sought the proper remedy for the vindication of its rights?   The council of the town, by repealing the ordinance has declared a forfeiture.   What is the effect of that action?   What is the character of the function performed in declaring the forfeiture?   Is it legislative, executive, or judicial?   Second.   Does the admitted failure of the railway company to comply with the conditions mentioned, operate a forfeiture, independently of the force and effect of the repeal of the ordinance?

No objection to the jurisdiction in equity or the remedy invoked has been raised by counsel.   Both sides ask an adjudication upon the merits.   But it has been suggested here, in consultation, that the action of the council in repealing the ordinance is judicial and is binding upon the parties until reversed by some appellate procedure, in consequence of which resort cannot be had to a court of equity as to any matter involved in, or governed by, this action of the council.   If this be true, the remedy is *certiorari,* under the statute.   Section 2 of chapter 110 of the Code of 1899.   But is it true?   This depends upon the nature of the proceeding, as well as the nature and scope of the remedy by *certiorari.* That writ is an extraordinary common-law remedy, except in so far as it has been altered by statute.   Originally, it could be invoked only to review judicial proceedings and to correct errors of law, apparent on admitted and established facts.   4 Enc. Pl. & Pr. 11.   "The office of a writ of *certiorari* is to bring to a superior court for review the record and proceedings of an inferior court, an officer, or a tribunal exercising judicial functions, to the end that the validity of the proceedings may be determined, excesses of jurisdiction restrained, and errors, if any, corrected.   It is not essential, however, that the proceedings should be strictly and technically judicial in the sense in which that word is used when applied to courts of justice, but it is sufficient if they are *quasi*-judicial.   It is enough if they act judicially in making their decision, whatever may be their public character."   6 Cyc. 750.   *Poe* v. *Machine Works,* 24 W. Va. 517. Our statute, sections 2 and 3, of chapter 110, concerning the remedy by *certiorari* is broad in its language, and, upon

an hasty reading thereof, would seem to import that the writ is applicable to all proceedings before county courts, municipal councils, justices and other tribunals; but, a careful examination of it leads to the conclusion that it does not broaden the scope of the writ as to the class of cases to which it applies. It says the writ shall lie in every case, matter or proceeding before a county court, council, a city, town or village, justice or other inferior tribunal, in which there has been a judgment or final order, or a judgment or order abridging the freedom of a person. What is the meaning of the words "every case, matter or proceeding"? Are they to be taken literally? Why did the legislature use these terms? A very good reason is that the proceedings reviewable by writ of *certiorari* are such in their very nature as can be described only by the use of general terms. They are proceedings not according to the course of the common law, but anomalous proceedings, various in number and unusual in kind. Common law proceedings are embraced under the designations of the forms of action such as *assumpsit*, debt, covenant, trespass, trespass on the case, ejectment and others. For all these, the writ of error is the process of review. In chancery causes the remedy is by appeal. But proceedings which do not fall within these classes of cases are indefinable by nature and must be referred to in general terms. This difficulty was experienced by the legislature, and the section under consideration bears evidence of it on its face, in the description of the classes of cases to which *certiorari* was applicable before the passage of that statute. It says "In every case, matter or proceeding in which *certiorari* might be issued as the law heretofore has been." Those were cases to which common law *certiorari* was applicable, and they are described in the exact language of the new statute. Prior to the passage of chapter 153, sections 2 and 3, of the acts of 1882, the present statute, we had no similar one on the subject, and the writ had only its common law force. This statute had other purposes than an increase in the classes to which the writ might apply. Prior to its enactment this mode of review was exercised before final judgment. This, the statute cut off by saying the judgment or order must be final, unless it is one abridging the freedom of a person. It limited the right to review in civil cases

before justices to those in which the amount in controversy, exclusive of interest and costs, exceed fifteen dollars. Prior to the passage of any statute on the subject, the reviewing court could only consider questions of law, such as want of jurisdiction in the inferior court and deviations from the law in pronouncing judgment upon admitted or established facts disclosed by the record. It would not determine questions of fact nor consider the evidence. This statute provides that, upon the hearing, the circuit court, in addition to determining such questions as might have been determined as the law was before its passage, shall review the judgment, order or proceeding of the inferior court or tribunal upon the merits, determine all questions arising on the law and evidence, and render such judgment or make such order upon the whole matter as law and justice may require. No decision of this Court has ever construed the statute as giving the right to review by *certiorari* as to cases, matters or proceedings non-judicial in their nature. It goes to a county court in cases of election contests. *Cunningham* v. *Squires*, 2 W. Va. 422; *Burke* v. *Supervisors*, 4 W. Va. 371; *Dryden* v. *Swinburn*, 15 W. Va. 234; *State ex rel* v. *McAllister*, 3 W. Va. 485. But these are all adversary proceedings involving the exercise of judicial functions. They involve the rights of parties in respect to matters distinct from the exercise of legislative or police power. In *Brazie* v. *Commissioners*, 25 W. Va. 213, the duties of election canvassing boards are declared to be *quasi*-judicial. Tested by that decision, the use of *certiorari* to review such proceedings is within the limits of judicial powers. In Board of *Education* v. *Hopkins*, 19 W. Va. 84, this writ was given to review the action of the county court upon a sheriff's settlement respecting an allowance of commissions to him. It was a matter of controversy between the sheriff and a board of education of the county and the county court had jurisdiction to the extent of power to adjudge a settlement *prima facie* correct, but not conclusive. This also, as to the sheriff, was a matter of private right, the determination whereof required the exercise of judicial power. The judgment of the county court for the time being, gave or withheld commissions claimed by him. It also made evidence for or against him, to be used in any other proceeding for the

final and ultimate determination of his rights. The line of discrimination between judicial and non-judicial functions is sometimes difficult to trace; but it is not difficult to see that the matters above mentioned stand upon a very different footing from many others, in which a municipal board or other tribunal, in the exercise of its legislative or police power, deals with the rights of the citizen who has no official connection with that body, such as a claim to office or a right to commissions. There is no suggestion by the Court in any of these cases that the action reviewed is not judicial or that the writ lies to review non-judicial actions. *Town of Davis* v. *Davis*, 40 W. Va. 464 presents a different and anomalous illustration of the writ, holding it to be appropriate to review the action of a town council in declaring a certain thing a nuisance and abating it as such; but the Court was careful there to say the act was judicial. Whether this was a correct determination, does not affect the question now under consideration. Consistently with the view here advanced, the Court treated the act as a judicial one and proceeded accordingly.

Whether the council of a municipal corporation acts judicially in ascertaining whether there is cause of forfeiture of a right in a street granted by it to a railway company is a more difficult question. As above stated, the distinction between legislative or ministerial functions and judicial functions is difficult to point out. What is a judicial function, does not depend solely upon the mental operation by which it is performed or the importance of the act. In solving this question, due regard must be had to the organic law of the state and the division of powers of government. In the discharge of executive and legislative duties, the exercise of discretion and judgment of the highest order is necessary, and matters of the greatest weight and importance are dealt with. It is not enough to make a function judicial that it requires discretion, deliberation, thought and judgment. It must be the exercise of discretion and judgment within that subdivision of the sovereign power which belongs to the judiciary, or, at least, which does not belong to the legislative or executive department. If the matter, in respect to which it is exercised, belongs to either of the two last named departments of government, it is not judicial.

As to what is judicial and what is not, seems to be better indicated by the nature of a thing, than its definition. It is necessary to the proper and effective exercise of the police power of a state or community that it be free from restraint by the judiciary. It is at variance with the very nature of such power that the officers and tribunals entrusted with its exercise must stop at every step and take those proceedings which are requisite to the due exercise of judicial power. The health of the people, the good order of the community and the due exercise of the power demand that the officers and tribunals, entrusted with its exercise, be free from such restraint. It may remove, destroy and abate, without waiting for any judicial determination, and leave the party to his right of appeal to the courts, by an action for damages, for a determination of the question as to whether the thing abated was a nuisance, or protected by a contract, unless the abatement will result in irreparable injury and thereby give equity jurisdiction by injunction. In the case of a contested election, or the settlement of the accounts of an officer and allowance of his commission, no such public necessity exists. Pending these controversies, the public service goes on unaffected by them and unimpeded. Not so, in the case of obstructions to streets and highways and the existence of offensive, unwholesome and dangerous things constituting nuisances. The public service cannot wait upon tedious long drawn out judicial investigations.

It would be difficult to enumerate all of the subjects belonging to the police power of a state or municipality, but that it does include the abatement of nuisances, the opening, construction and repair of roads and bridges and the lighting of streets is beyond question. 22 Am. & Eng. Enc. Law, 927. 29–30. That the establishment, control and regulation of roads, bridges and streets belong to the police power of the state is nowhere asserted more emphatically and plainly than by this Court. In *County Court* v. *Boreman*, 34 W. Va. 87, it is decided that private citizens, having no special property or interest to be affected, could not by *certiorai* review the trial or action of the county court in proceeding to alter the location of and rebuild a county bridge. Up until that time, these citizens had not made themselves parties to the proceeding. Afterwards, they did attempt to make themselves

parties, and to appeal from the action of the county court, and this Court prohibited the circuit court from entertaining the appeal by its writ of prohibition, for want of jurisdiction. *County Court* v. *Armstrong*, 34 W. Va. 326. JUDGE BRANNON, in delivering the opinion said: "We think it essential to the public interests, as involved in the execution by county courts of the important functions assigned them by law touching roads and bridges, that we should decide, as we now do, that citizens and tax-payers, merely because they are such, who have no special property or interests affected thereby, can not become parties to proceedings by county courts for the establishment, location or alteration or construction of county roads and bridges, and can not appeal from the action of the county court therein. Under any other rule, it would be impossible to say when litigation would occur, when it would end, what would be the public cost, or what would be the delay and obstruction in these matters so essential to the public welfare." The supreme court of Virginia announced the same doctrine in *Supervisors* v. *Gorrell*, 20 Grat. 484.

Of course, the citizen may object to the taking of his property for public use without compensation and interfere. But how does he interfere? Not by making himself a party to the unauthorized proceeding. He is not bound to subject himself and his rights to the assumed jurisdiction of a county court or a municipal council and review its action by *certiorari* in order to obtain relief. He appeals to a judicial tribunal having the power to settle and determine questions affecting his rights. He is entitled to have such important matters determined in the first instance, as well as finally by a court, by a judge or judge and jury, upon regular proceedings, according to the course of the common law, and not in an irregular, haphazard proceeding by mere agents of the state, unlearned in the law, and charged with mere ministerial or legislative powers. Although the citizen may have a special interest in the sense of being damaged by the exercise of the sovereign power to establish roads, if his property is not actually taken, but only injured, he still has no power to interfere and must resort to his action at law for damages. *Spencer* v. *Railroad Co.*, 23 W. Va. 406; *Arbenz* v. *Railroad*, 33 W. Va. 1; *Watson* v. *Railroad Co.*, 49 W. Va. 528.

A work of internal improvement, authorized by law, whether carried on by a private or a municipal corporation, is an exercise of police power delegated by the legislature, and is not subject to judicial control and is not itself judicial action. Corporations exercising such power are, so long as they confine themselves within the authority conferred, beyond any restraint at the hands of the judiciary. If, in the exercise of such power, they transcend the authority conferred upon them by the legislature they are, in some form of action, amenable to the power of the courts, at the instance of any individual injured thereby, and their decision or mere declaration that they have power, when they have not, affords them no protection.

The granting of a license, privilege or franchise to a street railway in the streets of a city, town or village is so manifestly an act affecting the street itself, the care and custody of which is, by law, entrusted to the council, by way of exercising part of the police power of the state, as to preclude the idea that such grant can be anything other than an exercise of such power. This is not disputed. Nor can it be denied that the repeal of the ordinance, granting such privilege, or a declaration of forfeiture in any other form, is a function of the same kind. But it is suggested that inquiry and determination as to the cause or ground of forfeiture is judicial. If so, it is only incidentally performed in the exercise of police power. It is not the thing done, the function performed, but a mere incident thereof. It is not the whole, including the exercise of police power as one of its parts, but is itself a mere part, governed, overshadowed, controlled and limited by something larger—a matter or function in government, which, for reasons of public policy, is not required to wait on the slow process of judicial determination of private rights which are incidentally and occasionally affected, but not extinguished by it, and, if injured, may be vindicated by proper remedies in the courts, in which the necessary judicial power for that purpose is lodged. It is an inclusive, subsidary or incidental power, which in the nature of things can be no broader than the thing to which it is incidental. Like the stream which can rise no higher than its source, or the blood which cannot circulate beyond the body to which it belongs, this function, be it *quasi*-judicial or not, cannot ope-

rate or be effective beyond the limits of the act or proceeding in which it is performed.    It does not determine the character of the proceeding in which it is performed, or alter or enlarge its nature.    That is determined by the division of governmental powers, effected by the organic law of the state. The very nature of the police power and the necessity for its free and prompt exercise forbid any such restriction upon it as judicial supervision and control.    To make it effective, those charged with its enforcement must be as free from restraint, as long as they confine themselves within their authority, as individuals are.    Must there be citation and hearing before the city authorities may tear down a building as a means of stopping a disastrous conflagration?    If a man erect a house or barn in the center of the principal street of a populous city, is he entitled to demand notice and a full judicial hearing before it can be removed?    If, instead of so proceeding, the authorities abate it immediately, are they trespassers simply for lack of such judicial proceeding, to be punished with costs and nominal damages in a case in which they have violated no right, and done no wrong, other than that of failing to obtain an adjudication of the right to do what they have done?    Are municipal corporations to be mulct in costs attendant upon judgments for nominal damages for mere technical invasions of the rights of the citizen, as well as delayed in the exercise of the important powers conferred upon them for the promotion of the health and comfort of the people, the maintenance of order, and the prosperity and general welfare of the community?    If we say the function is judicial in the full sense of the term, all these questions must be answered affirmatively, and such results attained as would paralyze the police power of the state.    It is not a question of due protection of the rights of the citizen.    It is not enough to say he may, by his writ of *certiorari*, accompanied by bond, supersede the action taken against him, pending the determination of the rightfulness of his claim.    That covers but one side of the question.    What about the public?    Is it duly protected and vindicated, or is it hampered, clogged and paralyzed?    If we say the function is judicial, we allow the citizen, in obtaining vindication of his rights, to stop the machinery of government.    If we say it is not judicial, he still has his remedy in the courts for any

injury done him, as in the case of injury done him by a private individual, and the machinery of government goes on performing its functions, while he prosecutes his rights in the courts.   He is no more entitled to stop, impede or delay the operations of government, except to prevent irreparable injury, than to stop an individual.  Are not the interests of the general public as great and as justly entitled to protection and freedom as those of his fellow man?  The only exception to this is the case of irreparable injury, which may be prevented by injunction, as in cases of irreparable injury at the hands of individuals.   If we say it is not judicial, there is no adjudication against the citizen.   He still has his remedy.   There is, therefore, no want of process. The legislature of the state, in declaring a forfeiture, performs exactly the same function that the council performed in this case.   It necessarily ascertains the existence of cause of forfeiture.   An individual, in declaring the forfeiture of a contract right, does the same thing.   But no court has ever regarded such declaration in either case as an adjudication.   Nor do they so regard such declarations made by municipal councils.

This Court, in *Railroad Co.* v. *Town of Alston*, 54 W. Va. 597, said: "If the council improperly annulled its orders or ordinances assenting to the plaintiff's occupancy of its streets, the plaintiff could treat such annulment as void, or it could have the same reviewed and reversed by proper judicial method of review."   In *Street Railway Co.* v. *Ashville* 109 N. C. 688, the court held as follows: "Where a city, by authority of its charter, granted a street railway company the right to construct a branch road over a certain street, it cannot, by a subsequent ordinance, arbitrarily annul its license ; and when, under such latter ordinance, it attempts by force to prevent the completion of the road, then in process of construction, injunction will issue restraining the city from such interference."   In *Railway Co.* v. *Easton*, 133 Pa, St. 505, this declaration of principles was announced:   "A railway track, laid upon a city street in good faith, under a corporate charter granted for the purpose, but not endangering the health or safety of the inhabitants, cannot be classed among the nuisances which the city authorities may abate summarily without resort to the processes of the law, even though, by reason of the manner of its construction, it may

obstruct the street to such a degree as to amount to a nuisance. When the authorities of a city have declared such a track to be in violation of a municipal ordinance and a public nuisance, and have summarily undertaken to remove it by force, and the railway company prays for an injunction against such removal, the city not applying, by cross-bill or otherwise, for a legal adjustment of the differences between the company and itself, the injunction will be granted without regard to the merits of the controversy." In *Bond* v. *Newark*, 19 N. J. Eq. (4 C. E. Green) 376, 384, the court said, speaking of municipal corporations, "All legislative acts or exercise of discretionary powers, within their authority, are beyond the control of the courts, however unwise or impolitic, or even when done from corrupt motives, or unworthy purposes. * * * But when the corporations have fulfilled their legislative functions, and have exercised their legislative discretion, and are about to fulfill a contract by paying for its performance with the money of the lot owners, they are not acting in a legislative capacity, but as agents." In *Railroad Co.* v. *Cape May*, 35 N. J. Eq. 419, Van Fleet, V. C., after quoting part of the above language, said when the corporation "are about carrying their legislation into execution, then, if the effect of their act is to violate vested rights or inflict irreparable wrong, the courts may properly intervene." That case decides that injunction does not lie to prevent the repeal of an ordinance, but does lie to prevent the tearing up of a railroad pursuant to such repeal, and thereby, in effect, denies judicial effect to the action of the council. In *Railroad Co.* v *Paterson*, 9 C. E. Green (N. J. Eq.) 158, 168, the court said: "The ordinance complained of is manifestly intended as a means to an unlawful end, as a basis of operations for removing the track in Colt street. There is no good reason for the course of procedure on which the city have entered in this matter. They cannot be permitted, under such circumstances, to pursue it."

In *Sinking Fund Cases*, 99 U. S. 700, Chief Justice Waite, in speaking of the reserved power to amend or repeal the charter of the Union Pacific Railroad Company, said: "All agree that it cannot be used to take away property already acquired under the operation of the charter, or to deprive the corporation of the fruits, actually reduced to pos-

session, of contracts lawfully made." In *People* v. *O'Brien*, 111 N. Y. 1, Ruger, C. J., said: "It is also to be observed that in none of the provisions for repeal in this State is there anything contained which purports to confer power to take away or destroy property or annul contracts, and the contention that the property of a dissolved corporation is forfeited, rests wholly upon what is claimed to be the necessary consequence of the extinction of corporate life. We do not think the dissolution of a corporation works any such effect. It would not naturally seem to have any other operation upon its contracts or property rights than the death of a natural person upon his. The power to repeal the charter of a corporation cannot, upon any legal principle, include the power to repeal what is in its nature irreparable, or to undo what has been lawfully done under power lawfully conferred." The same judge, in speaking of the grant by the city of New York to the Broadway Surface Railway Company, of the right to use the streets, said: "Grants similar in all material respects to the one in question have heretofore been before the courts of this state for construction, and it has been quite uniformly held that they are grants in fee, vesting the grantee with an interest in the street in perpetuity to the extent necessary for the purpose of a street railroad." "Both on reason and authority, a charter, lawfully granted and duly accepted and acted upon, has all the elements of a contract and is binding upon all the parties to it, and enforceable, if not always in the same manner yet to the same extent, as an ordinary agreement between natural persons." Booth on Street Railways, section 8. In *Street Railway Co.* v. *Circuit Judge*, 113 Mich. 694, the court held it competent for a city council to declare a forfeiture upon a conceded and undisputed breach of a condition. Plainly this means that the forfeiture is effective only in such case, just as such a declaration by an individual is effective when he has the right to make it, and, therefore, has none of the efficacy of a judicial determination.

The decision in *Town of Davis* v. *Davis*, 40 W. Va. 464, may seem to be inconsistent with this position, but it does not clearly propound a different doctrine. Whether it was intended there to give to the resolution of a municipal council the dignity and force and effect of a judicial decision,

binding upon the citizen and denying to him any remedy except by way of appeal from it, is not at all clear. In the paragraph of the opinion which seems to countenance this view, it is admitted that the proceeding for abatement of a nuisance is an exercise of delegated police power, and no authority is cited for the position that a judicial function is involved. The question of its conclusiveness is propounded and not answered except by the holding that there is a right of review by *certiorari*, and possibly of action for damages. If, after such abatement, a right of action exists, it is plain there has been no adjudication of the fact of nuisance. There cannot be two adjudications of the same right. One precludes the possibility of another, if pleaded.

The trouble with the decision in the *Town of Davis* v. *Davis* is its failure to distinguish between the function of abating a nuisance and that of determining what is a nuisance. Abatement is the exercise of police power. That power the legislature has conferred upon the councils of cities, towns and villages; but does not confer upon them the general judicial power necessary to determine what is a nuisance. They may determine it in a qualified manner, just as an individual in the exercise of his common-law right of abatement, may determine for himself what is a nuisance. His determination of that question is binding upon nobody. In like manner, the determination of the same question by a municipal council is a determination for the sole purpose of coming to a decision as to whether it will exercise its power of abatement. After having done that, as in the case of an individual, it acts at its peril. If, assuming that to be a nuisance which is not, it destroys it, the preliminary declaration affords it no protection and is not binding upon the citizen. When a court of competent jurisdiction determines that a thing is a nuisance, its decision, until reversed, is final and conclusive. Whether the thing be in fact a nuisance or not, it becomes in law a nuisance by force of the decision. The courts everywhere say no such power is vested in a municipal corporation or in the legislature of the state itself.

In *Hutton* v. *City of Camden*, 39 N. J. L. 122, the court said: "The right to abate public nuisances, whether we regard it as existing in the municipalities, or in the community, or in the hands of the individual, is a common-law right, and is

derived in every instance of its exercise, from the same source—that of necessity. It is akin to the right of destroying property for public safety in case of the prevalence of a devastating fire or other controlling exigency. But the necessity must be present to justify the exercise of the right, and whether present or not, must be submitted to a jury under the guidance of a court. The finding of a sanitary committee, or of a municipal council, or of any other body of a similar kind, can have no effect whatever, for any purpose, upon the ultimate disposition of a matter of this kind."

Dillon on Municipal Corporations (4th Ed.) at section 374, says: "This authority and its summary exercise may be constitutionally conferred on the incorporated place, and it authorizes its council to act against that which comes within the legal notion of a nuisance; but such power, conferred in general terms, cannot be taken to authorize the extra-judicial condemnation and destruction of that as a nuisance which, in its nature, situation, or use, is not such." In *Yates* v. *Milwaukee*, 10 Wall. 497, Mr. Justice Miller said: "But the mere declaration by the city council that a certain structure was an encroachment or obstruction did not make it so, nor could such declaration make it a nuisance unless it in fact had that character. It is a doctrine not to be tolerated in this country that a municipal corporation, without any general laws either of the city or of the state within which a given structure can be shown to be a nuisance, can, by the mere declaration that it is one, subject it to removal by any person supposed to be aggrieved, or even by the city itself. This would place every house, every business, and all the property in the city, at the uncontrolled will of the temporary local authorities."

All this argues lack of judicial power in such tribunals. It is because of want of such power and authority that their resolutions, declarations or determinations, respecting personal and property rights, are ignored by the courts. Being non-judicial, the authority must be ministerial, legislative or executive. It may be that the Court, in *Town of Davis* v. *Davis*, entertained the view that, in the exercise of police power, there is a right of review by *certiorari*, although the proceeding is not an adjudication, precluding a resort to the courts for damages. Whether, so viewed, the decision is,

sound, there is no occasion to say; and, but for the close analogy between that case and this, it would be unnecessary to re-examine it. It is not a case exactly in point, but many of the general principles involved in it are, to say the least, very similar to those governing this case. Being firmly of the opinion that the council of a municipal corporation is not clothed with the requisite judicial power to finally determine questions of property rights, in such cases as this, we cannot recognize it as authority binding upon us in this class of cases, and we leave its exact status and effect in nuisance cases to be determined whenever the necessity therefor shall arise. Nor are we to be understood as saying or intimating that the legislature cannot, or has not, conferred limited judicial power upon municipal corporations for the punishment of offenses and violation of ordinances.

Having reached the conclusion that jurisdiction in equity is not precluded by the action of the council, the next question is whether there has been such non-performance of covenants as gives power to forfeit by proper proceedings. Authorities already cited, to which many more might be added, show that, by acceptance, the ordinance became a contract. Can it have effect otherwise than according to its terms? To say that it can would be to deny to parties the power to determine their respective rights by contract, or, to say, after a contract has been made, its terms may be disregarded. Courts cannot do that, the power to do which is denied to the legislature by both the state and federal constitutions, namely, deny, relieve from, or refuse to enforce, the obligations of contracts. Non-compliance with the terms and conditions of the ordinance is frankly admitted, and the prayer for relief stands upon the allegation of substantial compliance. This argument is addressed to the court, concerning, not implied conditions, which the law reads into a contract in order to work out equity and justice between the parties as to matters not provided for by express stipulation, or express conditions, violation of which is not, by express stipulation, made cause of forfeiture, but conditions and covenants plainly written in the contract and the penalty for violation of which is expressly made a cause of forfeiture. Courts of equity have large powers for the vindication of equitable rights, and, under peculiar circumstances, for the amelioration of the

rigidity of the law, but they cannot, any more than courts of law, ignore or violate contract rights, fairly and properly acquired. There is here no suggestion of fraud or mistake in the procurement of the contract. It was deliberately and fairly entered into. Substantial compliance with the terms of an express contract never excuses the party in fault or supports a prayer for equitable relief against its obligation. The party not in default may hold the other to the performance of so much as he is able to do. He has a right of election to take that, rescind the contract or, standing upon it, sue for damages for the breach; but no instance is recalled in which one party to a contract has been permitted to compel the other to accept less than full performance.

The authorities relied upon to sustain the position that substantial compliance with conditions, the violation of which is expressly made ground of forfeiture, do not support that view. They are all cases in which the ordinances did not say failure to comply with certain specific conditions, the conditions there in question, should result in forfeiture of the privilege granted. There was no such stipulation in the act construed by the court of appeals of New York in *People* v. *Broadway, &c., Co.*, 26 N. E. 961. The propositions asserted in Booth St. R'ys, section 45, are inapplicable for the same reason. At section 46 of the same work, it is said: "But if the statute provides that upon such failure the franchise shall be terminated or shall cease, the default will put an end to the franchise without judicial proceedings, and the legislature may confer the franchise upon any other company or person." And this is fully sustained by the following decisions cited in suport of it: *In re Brooklyn, &c., Ry. Co.*, 72 N. Y. 245; *In re Brooklyn, &c., Ry. Co.*, 75 N. Y. 335; *Brooklyn, &c., Ry. Co.* v. *City of Brooklyn*, 78 N. Y. 524; *Oakland R. R. Co.* v. *Oakland, &c., R. R. Co.*, 45 Cal. 365. Continuing, the author says, in the same section: "The same rule applies to a grant made by ordinance. Accordingly, if the company fails to build within the time fixed by the local authorities the privilege no longer exists. Such consent is a mere license, and until the grantee avails itself of the privilege, no obligation or relation arises which requires a judicial declaration of forfeiture. After the time expires, a renewal of the privilege is necessary to entitle the

company to occupy the streets and build its road." This is sustained by *Ft. Worth Ry. Co.* v. *Rosedale Ry. Co.*, 68 Tex. 169, and *Railway Co.* v. *Railway Co.*, 48 Mich. 433. For similar applications of the same principle, see *Ward* v. *Sea Ins. Co.*, 7 Paige (N. Y.) 294; Matter of *Jackson, &c., Ins. Co.*, 4 Sand. Chy. 559. "Slight deviations from the provisious of a charter would not necessarily be either an abuse or a misuser of it, and would therefore be no ground for its annulment, although it would be competent for the crown, by apt words, to make the continuance of the charter conditional upon the strict and literal performance of them." *Eastern, &c., Co.* v. *Regina*, 2 El. & B. 856, 870. As to railway franchises and privileges, see also *Railway Co.* v. *Railway Co.*, 45 Cal. 373; *Myrick* v. *Brawley*, 33 Minn. 377. In the absence of the stipulation for forfeiture as to the conditions not complied with here, it could be held, consistently with all authority, that there has been a substantial compliance with the contract as a whole, and, therefore, no cause of forfeiture. But it is competent for the parties to make any condition a material and essential part of the contract. As these parties have done so, how can the Court deny to one of them the benefit of the contract, or relieve the other from its obligation? A distinction between conditions precedent and conditions subsequent is made by the courts. The condition in this case belongs to the latter class, but the distinction does not seem to relieve the company. In the former class, no declaration or adjudication of forfeiture is necessary, but in the latter it is, since non-compliance may be waived. *Hovelman* v. *Railroad Co.*, 79 Mo. 632; *Chicago* v. *Railway Co.*, 105 Ill. 73, 78.

Having thus determined that there was, on the face of the contract, cause for forfeiture, it remains to be determined whether such steps were taken by the council as to work, a forfeiture; and, if so, whether the circumstances under which it has been done, and the conduct of the municipal authorities in accomplishing it, have been such as to call upon a court of equity to ignore it or to relieve against it. In dealing with this situation, the court must keep its eye upon both sides of this contract and both parties to it. It is not a one-sided affair. It places duties upon both. Under the strict letter of the contract mere failure to comply with conditions

works no forfeiture.    However great the cause of forfeiture, it does not occur until it has been legally and properly de-declared by the corporation.    The mode of effecting it is pre-scribed by the ordinance.    It requires three months' notice of intent to declare it, accompanied by specification of the cause.    The ordinance was passed in 1896.    Within a short time after that, the road was built and was then operated un-til August, 1901, without any steps having been taken by the town, in the manner prescribed by the ordinance, to require compliance with these conditions.    For four or five years, the town acquiesced in absolute non-compliance on the part of the railway company.    There is no proof or evidence, show-ing that any notice was ever served upon the company specify-ing these instances of non-compliance.    There is some evidence tending to show that officers of the town had been directed to serve notice on the company, and that one member of the council did verbally make a demand upon, or request of, the president, but it does not appear that any such notice as is prescribed by the ordinance was ever given.    But if such no-tice had been given, and not followed by any further action, it would simply tend to prove acquiescence and waiver.    In August, 1901, after four or five years of acquiescence, the council took steps to forfeit by service of notice.    Then be-fore the expiration of the time allowed there was a partial compliance with the requirements of the notice, a substantial compliance with its requirements.    In view of the long ac-quiescence of the authorities of the town, the railway com-pany may well have supposed, and no doubt did suppose, that no action to forfeit the franchise would be taken under these circumstances.    If the testimony of the manager is entitled to credit, and there seems to be no reason for believing oth-erwise, the failure to comply fully was due, in part, to dis-appointment in obtaining the lumber from the place, and within the time, contemplated by the company.    He says the order was given to mills in the country but, as time went on and it did not arrive, they were compelled hastily to obtain it from somebody in the city.    They gave the order for first class lumber and under that order lumber was furnished and put down by the company's employees.    It did not prove to be of the requisite dimensions and some portions of it were unsound and it had the appearance of being old, but it had

never been used. This repealing ordinance was passed immediately after the timber was put down and possibly before it was all down, and without any intimation of dissatisfaction with the work. Immediately afterwards, the manager of the railway company applied to members of the council for information as to their objection to the work and offered to remedy the defects, but was informed that the ordinance had been repealed and all rights of the company forfeited.

While the town has the right to require full and complete performance of all covenants on the part of the railway company, and is not bound to accept a mere substantial performance, its authorities, in proceeding to take away the rights of the company, pursuant to the terms of the ordinance, must deal frankly and fairly with it. They must act in good faith and not endeavor to pervert this forfeiture clause to a purpose for which it was never intended. Neither party ever supposed it would be used for any purpose except to compel performance of the covenant entered into by the railway company. The public interests required the construction and operation of the railway. That was the inducement or consideration moving the town to the passage of the ordinance. It was also of interest to the public that the streets be kept in good condition. Hence, the provisions in reference to them, and the right of forfeiture to enforce performance thereof. That clause was never inserted for the purpose of ousting the railway company from the occupancy of the streets merely to get rid of it or to compel it to seek a new franchise with conditions more favorable to the town, nor at all, unless it refused to perform its covenants. Nothing in the answer of the defendant suggests a desire to get rid of the railway. On the contrary it evinces a desire to keep it, but to impose conditions more favorable to the town than those contained in the present ordinance. On the whole, the evidence evinces a purpose, not merely to enforce compliance with the conditions of the ordinance under which the railway company had been operated, but to force that company to apply for a new franchise with new conditions, a purpose wholly foreign to the forfeiture clause. This motive apparent on the face of the answer and in the evidence, taken in connection with the circumstances and conduct hereinbefore adverted to, tends to prove that the declaration or for-

feiture was not made in the utmost good faith, that the fail-use on the part of the railway company to comply with conditions was not willful, in the sense of obstinacy, but, at the worst, negligent, and that the previous acquiescence and delay on the part of the town, followed by the sudden and speedy repeal of the ordinance, operated as a surprise upon it. By this, actual fraud is not imputed to the authorities of the town. Nor is it intended to impute any dishonest motive or purpose to them. It is an error of judgment, a misconception of legal rights and duties, working inequitable results. The answer shows a frank avowal of sincere belief, on their part, in their right to use this power of forfeiture to coerce a more liberal proposition from the railroad company, and shows an utter lack of appreciation of the force and effect in equity of their long acquiescence in non-performance and the suddenness of the blow they have attempted to deliver by repealing the ordinance. Not being chancellors, conversant with the principles of equity, they could, as many others have done, easily fall into errors of grave character, without being guilty of the least dishonesty or fraud in the ordinary sense of the terms, and it is perfectly apparent that they have done so. Such circumstances warrant intervention by a court of equity to relieve from forfeiture, when no pecuniary or substantial injury has resulted and full performance of the covenant can, and will, be effected. Willingness and desire to comply strictly with all its covenants is plainly expressed by the railway company in its bill, and was verbally communicated to the town authorities immediately after the forfeiture was declared, when the ink on the repealing ordinance was hardly dry. As to the ability of the company to make full compliance, there is no question. Under these circumstances, is it equitable and just to the company, or promotive of the public interests, to destroy this railway? It represents an investment of thousands of dollars and affords means of convenient and rapid travel and transportation for the people of the town and the general public. Why so great a punishment for such slight cause? It is unprecedented so far as the authorities examined disclose. If the injury could not be remedied, or the railway company stood defiant, refusing to perform, the case would wear a different aspect, but

it does not.   It is willing to perform to the letter—to pay to the last farthing.

In *Hukill* v. *Myers*, 36 W. Va. 639, this Court applied the principle of relief against forfeiture, and declared as follows in respect to forfeiture of an oil lease: "In case of such a lease, if the lessor by his conduct clearly indicates, that payment will not be demanded when due, and thus lulls the lessee into a feeling of security and throws him off his guard, and because of this he does not make payments when due, the landlord cannot suddenly without demand or notice declare a forfeiture, and there is no forfeiture which equity would recognize, and, if there is in such case technically a forfeiture at law, equity would relieve against it." It may be objected that because the covenant violated here is not a pecuniary one, jurisdiction in equity to relieve it does not exist. It is said that in the English courts equity will only relieve in such cases. But this is not strictly accurate. Where the covenant is pecuniary, and there is default and consequent forfeiture, equity will relieve independently of the circumstances of fraud, accident, mistake and surprise. But, where fraud, mistake, accident or surprise enters into the matter, or the forfeiture has resulted from only negligent conduct on the part of the covenantee, equity will interfere, although the covenant be for the performance of some collateral matter and not for the payment of money. Story Eq. Jur. § 1323. In section 1324 of said work, it is said that in America the narrow doctrine of the English courts and the restricted application of jurisdiction to relieve from forfeitures would be received with hesitation, and, substantially, that the jurisdiction is broader in this country. In cases of forfeiture for non-performance of pecuniary covenants, relief in equity goes as a matter of course, where compensation may be made, but in other cases, unless the delinquency is willful, the court has discretionary power to relieve. "A court of equity has power to relieve a party against forfeiture or penalty incurred by the breach of a condition subsequent, when no willful neglect on his part is shown, upon the principle that a party having a legal right shall not be permitted to avail himself of it for the purpose of injustice and oppression." *Noyes* v. *Anderson*, 124 N. Y. 175. The forfeiture in this case was for failure to pay an assessment for a sewer. "When

a mortgagor, without his fault or neglect, is prevented by accident from paying an installment on the day named in a decree of foreclosure, on a bill brought to redeem, equity will grant relief; and he will be re-instated, but on terms that he satisfy the equitable rights of the other party." *Kopper* v. *Dyer*, 59 Vt. 477. "Equity will relieve against a forfeiture incurred by the breach of a covenant to insure in a lease of real estate, caused by accident or mistake, if no actual damage has been sustained by the lessor." *Mactier* v. *Osborn*, 146 Mass. 349. "A court of equity may grant relief from the forfeiture of an estate conditioned for the maintenance and support of the grantee where the forfeiture was accidental and unintentional, and not attended with irreparable injury. But it rests in the sound discretion of the court when relief shall be granted in this class of cases." *Henry* v. *Tupper*, 29 Vt. 358. This is a leading case, and the opinion was written by Chief Justice Redfield, who, in the course of his opinion, said: "That relief might be granted in equity, even where the condition was for the performance of collateral acts, seems to be admitted in most of the cases upon this subject. *Webber* v. *Smith*, 2 Vernon 103; *Hack* v. *Leonard*, 9 Mod. 90; *Cox* v. *Higford*, 2 Vernon 664; *Saunders* v. *Pope*, 12 Vesey 282. These are cases of non-repair of premises leased; and the chancellor, Lord Erskine, says in the last case, 'I cannot agree it is necessary the non-performance of the covenant should have arisen from mere accident or ignorance.' The cases are abundant where relief has been granted against forfeiture of title by non-performance of other collateral acts, as for not renewing a lease. *Rowstone* v. *Bentley*, 4 Br. C. C. 415; or for cutting down timber when covenanted against, on pain of forfeiture; *Northcote* v. *Duke*, Ambler, 511; *Thomas* v. *Porter*, 1 Ch. Ca. 95. But it has been held relief will not be granted where the forfeiture arises from an act incapable of compensation, although of no essential damage to the other party, as the breach of a condition not to assign. *Wafes* v. *Mocato*, 9 Mod. 112. The same rule obtains where the forfeiture arises from an omission to insure. *Rolfe* v. *Harris*, 2 Price 206. * * * * It seems, however, to be pretty well established in England, that relief for non-repair of premises will not be granted as matter of course, and especially when there was

a willful default. *Bracebridge* v. *Buckley*, 2 Price 200; *Hill* v. *Barclay*, 16 Vesey 403 and 18 *Id.* 56. But where the failure is from 'accident, fraud, surprise or ignorance not willful,' relief will be granted; 2 Lead. Cas. in Equity, 464, 465; *Eaton* v. *Lyon*, 3 Vesey 693; the result of all which seems to be, that there is no well settled rule upon the subject, or none which is not liable to considerable variation, and to be affected by the circumstances of the particular case. * * * * But we must all feel that cases of the character before the Court should be received with something more of distrust, and relief afforded with more reserve and circumspection, than in ordinary cases of collateral duties. And although we are not prepared to say that it must appear that, in all cases, the failure arises from surprise, accident, or mistake, we certainly should not grant relief when the omission was willful and wanton, or attended with suffering or serious inconvenience to the grantee, or there was any good ground to apprehend a recurrence of the failure to perform, as was held in *Dunklee* v. *Adams*, 20 Vt. 421.''

It may be objected here that this position is in violation of the rule that equity will not relieve against a statutory forfeiture. Pom. Eq. Jur. 458; *Railway Co.* v. *Fitler*, 60 Pa. St. 124. But this ordinance partakes of the nature of a contract. It is generally held, in such cases, that the relation of the parties is contractual. The power of municipal corporations to contract cannot be denied. This ordinance is not a statute. By its very terms it establishes a relation of contract. It does not provide for forfeiture without action on the part of the council. Unlike a statute granting a privilege or franchise and declaring forfeiture as the penalty of non-compliance with conditions, it provides for notice and active steps on the part of the council to bring about forfeiture. It was agreed that, in order to effect a forfeiture, the town authorities should adopt just such methods as one individual resorts to to bring about the forfeiture of the rights of another individual under a contract existing between them. Municipal authorities are agents as well as legislators and are, in great measure, subject to the legal principles governing transactions between private persons. Many cases hold that municipal corporations are precluded by their conduct from enforcing forfeitures. ''A court of equity will not enforce

a forfeiture of the rights and privileges of the grantees in a contract for their failure to complete their performance of it in time, where the party seeking the forfeiture was guilty of the first breach of the agreement." *Powder Co.* v. *Colorado Spring*, 105 Fed. Rep. 1. In that case, the party seeking forfeiture was a municipal corporation. "Where a street railway company has expended large sums of money and exercised due diligence in building and operating its road, so as to comply with an ordinance of permission, but unforeseen circumstances have caused a delay, which has occasioned no pecuniary injury to the township or its inhabitants, equity will interfere to restrain the adoption of an ordinance by the township declaring a forfeiture of the franchise of the corporation because it did not comply with the statute of permission, which provided that cars should be running at a certain headway, on a continuous line of double track, within a specified time." *Railway Co.* v. *South Orange*, 58 N. J. 83. In *Chicago* v. *Railroad Co.*, 105 Ill. 73, the court enjoined the city from interfering with the laying of the track of a railway company after the expiration of the time limited by the ordinance, because the company had been prevented by injunctions, *and by the police officers of the city, acting under the direction of the mayor*, from prosecuting its work, in conseqence of which the limit expired before it was completed. In this respect, municipal corporations seem to stand upon the same footing as individuals. They are subject to the law of estoppel by acts *in pais.* "But of late years, much more than formerly, the doctrine of estoppel, most wholesome and just in its operation when properly applied, has been extended to these municipal corporations, so as to bind and conclude them by their own acts and acquiescence, and the acts and acquiescence of their officers, whenever an estoppel would exist in the case of natural persons." *Kneeland* v. *Gilman*, 24 Wis. 39. See also *Mutel* v. *East St. Louis*, 94 Ill. 67; *Railroad Co.* v. *Joliet*, 79 Ill. 25; *Wilson* v. *Wheeling*, 19 W. Va. 323, (syl. pt. 12). This is subject to the limitation that the subject-matter must not be *ultra vires*—must be within their authority. Here the town had undoubted right and power to waive non-performance of covenants, or extend the time.

As above indicated, however, there must be full perform-

ance of the covenant as a condition of relief. The relief is against the forfeiture, on the ground of inequitable conduct, working surprise, not against the contract or from its obligation. We do not take away either the right to have the delinquency made good or the power to forfeit for future delinquencies. The covenants for the non-performance of which forfeiture has been declared must be performed and that fully and promptly.

In the event of refusal to perform, another question would arise, namely, whether the bill should be dismissed or retained and affirmative relief granted the defendant by way of enforcement of the forfeiture. As we cannot say such contingency will not arise, though there is hardly any probability of it, we must now give direction as to the course to be pursued in that event, else the principles of the cause will not be fully settled, and another appeal might result, involving a question already presented on this appeal. Cross relief has been given by the decree.

Never to declare or enforce a forfeiture, or divest an estate or title for violation of a condition subsequent, is an invariable rule of equity, if there is a legal remedy. Under such circumstances, a court of equity utterly declines to touch the case and leaves the party to his legal remedies. In the language of a former able judge of this Court, now deceased, equity abhors a forfeiture. Our leading case on the subject is *Craig* v. *Hukill*, 37 W. Va. 520. See also *Livingston* v. *Tompkins*, 4 Johns. Chy. (N. Y.) 415, (8 Am. Dec. 598); *Horsberg* v. *Baker*, 1 Pet. (U. S.) 232; *Marshall* v. *Vicksburg*, 15 Wall. 146. This is different from an appeal to equity for aid in the abatement of a nuisance. In such case there is no forfeiture, and no vested title or right as against the public. The thing proceeded against is wrongful. Here, a title vested by contract and the effort is to take it away by forfeiture. To do this the town must resort to its legal remedies, if any are available. Besides the right of abatement without judicial proceedings, if it can be done peaceably, there are remedies in the law courts. There is much authority for the position that a municipal corporation has its possessory action for a street against a railway company having no right to occupy it. Dillon Munic. Cor. sections 662 and 723. What others it may have it is unnecessary to inquire.

To prevent equity jurisdiction for this purpose, it suffices that there is one.

Agreeably to the principles and conclusions, above stated, the decree appealed from will be wholly reversed, with costs, and the cause remanded to the circuit court of Ohio county, with directions to perpetuate the injunction, if the covenants in question shall be fully and properly performed by the appellant within a reasonable time to be allowed for the purpose, if they have not already been so performed, but without prejudice to the right and power of the town of Triadelphia to forfeit the privileges of the appellant under the said ordinance for any future failures to comply with the conditions thereof; and to dismiss the bill if the appellant shall refuse to perform said covenants within the time to be allowed therefor as aforesaid.

*Reversed.*

BRANNON, PRESIDENT :

If equity has jurisdiction, I find no fault with the actual decision of this case. If the decision of the town council is a nullity, injunction lies; but if it has a legal force, I am not clear that injunction lies. The grant of the franchise vested the council with jurisdiction or power to examine the facts and determine whether the town ordinance had been complied with, or whether the franchise had been forfeited. Is not the repeal, declaring forfeiture, a judicial act? The council was a public body exercising legal function in this matter, and it has been difficult for me to see that its judgment repealing the charter is mere wind, without legal force. If erroneous on the facts, still it has force until reversed. To reverse the writ of *certiorari* is the process, not injunction, because *certiorari* is, and injunction is not, a process to correct error. By the Code of 1899, chapter 110, section 2, *certiorari* applies not only as it was by common law, but it is enlarged so as to apply to "every case, matter or proceeding before a county court, council of a city, town or village, justice or other inferior tribunal." I do not therefore consent to the overruling of the case of *Town of Davis* v. *Davis*, 40 W. Va. 464, pt. 7. The common law principles stated in *Cunningham* v. *Squires*, 2 W. Va. 422, and *Poe* v. *Machine Works*, 24 *Id.* 517, would likely justify *certiorari* in this

case, but if not, that statute would seem to do so. In this case there was a notice that the ordinance had not been complied with by the company, warning it that if it did not comply within a given time, its franchise would be repealed; but there was no notice giving time and place of the hearing of the question whether such warning had been heeded and the conditions of the grant complied with. Now, it may be that as the repeal was *ex parte*, without hearing the company, the order of repeal is not one between parties, and that for that reason an injunction lies, as the injury is irreparable. If the company had been summoned, or had been heard, I think *certiorari*, not injunction, would lie. I think that the statute enlarges the scope of the writ, since that is imported by its words, and this Court has several times so looked at the statute. *Fouse* v. *Vandervort*, 30 W. Va. p. 330; *Chenowith* v. *Commissioners*, 26 *Id.* p. 233; *Morgan* v. *Railroad*, 39 *Id.* 221. In the *Chenowith Case* JUDGE SNYDER said that the statute gives review by *certiorari* "and makes no exception as to whether the matters to be reviewed are judicial or merely ministerial." JUDGE DENT has said as to this statute "the legislature has seen fit to recognize town councils as inferior judicial tribunals in the determination of questions involving the rights of individuals and property, and has made their decision subject to review by the higher judicial tribunals of the State. It has thereby rendered unnecessary the appeal to equity in such cases, unless irreparable injury is threatened, or it is necessary to preserve the property *in statu quo* until the right thereto can be properly determined." *Clifton* v. *Town of Weston*, 54 W. Va. p. 255. If a town council's order is good in any case until reversed, I do not see how injunction lies. In this case right to property of great value was involved, making the case one adversary in character. My idea is that the statute aimed to give *certiorari* in every case where rights of parties are involved, in the instances indicated by the statute, where no appeal or writ of error lies to the proceedings before the tribunals referred to in the statute. In cases where writ of error or appeal lies, they are the remedies. The legislature knew that in cases before inferior tribunals rights of property of great importance are sometimes invovled, and I think it designed to make *certiorari*, in such cases, commensurate for relief with appeal and writ of error.