# CHARLESTON

ADAMS *et al.* *v.* THE GUYANDOTTE VALLEY RY. Co.

Submitted March 19, 1908.     Decided March 24, 1908.

1. QUIETING TITLE—*Cloud on Title—Contract.*
   A contract, purporting to impose a burden upon, or vest a right in, real estate, on the performance of a condition precedent, under which, because of failure to perform the condition, no right, title or interest has vested, or can ever do so, will be canceled by a court of equity, on a proper application for cancellation thereof. (p. 183.)

2.  CONTRACTS—"*Condition Precedent and Subsequent.*"

Conditions precedent and subsequent differ in this: the former is one by the performance of which a right, estate or thing is obtained or gained; the latter, one by the performance of which a right, estate or thing already obtained is kept and continued.   (p. 187.)

3.  SAME.

Whether a thing stipulated to be done is a condition precedent depends upon the intention of the parties, to be gathered from the form of the stipulation, the general and immediate contexts, the nature of the subject-matter, the purposes the parties had in view as disclosed by the whole instrument, and such extraneous evidence as is admissible under the rules of construction, when the parties have not in terms agreed that it shall be such.   (p. 188.)

4.  SAME.

Under the broad liberty of contract allowed by the law, parties may make performance of any comparatively, or apparently, trivial and unimportant covenant, agreement or duty under the contract a condition precedent, and, in such case, the contract will be enforced or dealt with as made.   (p. 192.)

5,  SAME.

Though the time within which an act is required to be performed by a contract is often unimportant, it is competent for the parties to make it an essential element or part of the condition; and, if it be something other than the payment of money, the terms used respecting it, such as import a condition rather than a covenant, and no remedy for compelling performance is provided and no right of action for non-performance thereof can arise, and the parties have agreed that the contract shall not be binding upon them in case of failure to perform within the time stipulated, the intention to make the time an essential element is plainly indicated.   (p. 189.)

6.  SAME.

The following stipulation in a contract between a railroad company and land owners, providing that the former shall have certain rights respecting the land in consideration of the contruction of its railroad: "It (the railway company) will cause the said railway to be commenced within one year and completed and in operation opposite the said lands of the parties of the first part by the first of January, 1903, and it is understood that, if the said railway is not completed and in operation by the said date, this agreement shall no longer be binding upon the parties hereto," states a condition precedent of which the time of performance is an essential part.   (p. 184.)

7.  SAME—"*Opposite.*"

The term "opposite" in such a stipulation must be liberally and reasonably construed, so as to carry into effect the general in-

tention and purposes expressed in the contract, and means a place or places from which the land can be reached for development of its resources, it being underlaid with coal, economically and conveniently, considering the topography of the land and all the material circumstances; and completion of the road, within the time, to a point ten miles distant from the place from which this can be done is not a compliance with the condition, although it is possible to build a branch road to the land from such distant point. (p. 186.)

8. Cancellation of Instruments—*Parties.*

In a suit to cancel the contract, it is immaterial that the plaintiffs are vendees of former owners who made the contract, and purchased after the failure to perform the condition and after the road had been built: and also that their vendors were not made parties thereto. (p. 194.)

Appeal from Circuit Court, Cabell County.

Bill to cancel a contract by P. C. Adams and others against the Guyandotte Valley Railway Company and another. Decree for defendants, and complainants appeal.

*Reversed.    Contract Cancelled.*

Walter Pendleton, for appellants.

Simms, Enslow, Fitzpatrick & Baker, for appellees.

Poffenbarger, President:

The circuit court of Cabell county having dismissed their bill against the Guyandotte Valley Railway Company and the Chesapeake & Ohio Railway Company, praying the cancellation of a certain contract, purporting to vest in the former company an interest in the coal in 3,100 acres of land, belonging to the plaintiffs, as a cloud upon the title to said land, P. C. Adams, W. L. Rector, G. H. Chenowith, J. N. Chenowith and Brooks Summerville have appealed from the decree.

From the bill it appears that George F. Miller, George N. Biggs and C. W. Watts, owners of certain lands, situate in Lincoln county, and containing about 3,100 acres, entered into the contract in question on the 20th day of July, 1899. On March 27, 1902. they conveyed the land to J. D. Porter, who, on the same day, conveyed it to P. C. Adams and W. L. Rector. On the 28th day of December, 1903, Rector conveyed an undivided three-sixteenths of it to G. H. Chenowith, J. N. Chenowith and Brooks Summerville. All the

plaintiffs, therefore, appear to have purchased the land after
the contract had been made. The agreement was made with
the Guyandotte Valley Railway Company, which was after-
wards consolidated with the Chesapeake & Ohio Railway
Company. After reciting the proposed construction of a
railroad up the Guyandotte River by the Guyandotte Valley
Railway Company, the ownership of this land by Miller,
Biggs and Watts, and the advantages to them and their land
to accrue from the construction of the railroad, the contract
says the parties agree and covenant with one another, in the
manner thereinafter stated, in consideration of the premises,
the mutual covenants and agreements therein made, and one
dollar in hand paid, for the purpose of aiding the said rail-
way company in the construction of its railroad and also for
the purpose of creating a basis for the construction of said
railroad. The land owners agreed to do five things: First,
that they would lease or cause to be leased for coal mining
or coal coking purposes any part of the land that lies upon or is
drained by the stream emptying into the Guyandotte River,
to any party or parties presented by the railway company or
its assigns, with all such privileges as are necessary and
proper for the conduct of mining operations, no single lease
to cover more than 1,000 acres unless mutually agreed to by
the parties, and the land owners to have the right to choose
a lessee or lessees for any proposed lease after giving the
railway company or its assigns ten days notice in writing to
present such lessee or lessees; second, that the royalties under
such leases should be not less than eight cents per ton of
2240 pounds; third, all royalties accruing under such leases
should be equally divided between the parties to the agree-
ment; fourth, that the land owner should have the right to
mine the coal from any 1,000 acres, but in that event they
should pay the railway company four cents per ton royalty;
and fifth, that the railway company should have all necessary
rights of way 100 feet wide for all railroads on its
main line and 60 feet on its branches, together with all nec-
essary switches, depot and other railroad privileges free
of cost, as well as grounds for tipples, and other necessary
buildings. The covenants and conditions imposed upon the
railway company were two in number, only the first of which
is important, which reads as follows: "It will cause the said

railway to be commenced within one year and completed and in operation opposite the said lands of the parties of the first part by the first of January, 1903; and it is understood that, if the said railway is not completed and in operation by the said date, this agreement shall no longer be binding upon the parties hereto." There is a clause in the contract providing for submission of disputes arising under it to arbitrators, but this we deem unimportant, because the questions here involved are whether any right ever vested under the contract, and, if so, whether it has been forfeited. The controversy involves not a dispute arising under the contract, but the existence and binding force of the contract. Moreover, arbitration is not made a condition precedent to a right of action on it, if this suit could be regarded as founded upon it.

Like that of most of the other smaller streams of this state, the course of the Guyandotte River is far from straight. Its meanderings are numerous and divergent in direction, there being many crooks and bends in it, in consequence of which it runs at different places in different directions, though it maintains a general course, not very clearly indicated by the evidence. The railroad follows the river. The land in question is not located on the river or the railroad. The shortest distance between it and the railroad is two and one-half or three miles, over a high ridge, which would make access to it from that point by a spur or branch road impracticable. From other points upon the road it lies distant from five to seventeen miles. In view of this peculiar situation, it is somewhat difficult to determine just what the parties meant by the term "opposite the land," used in the clause requiring the railroad to be completed to that point by the first day of January, 1903. This element of uncertainty forms the basis of contention as to whether that condition was complied with. According to the testimony, the point on the railroad from which it is practicable to reach the land by a branch road is the mouth of the Big Ugly Creek. There, on the completion of the road, what is known as Gill Station was established, and, from it, to the land the distance is about ten miles up Big Ugly Creek. In the spring of 1902, the road had been built to a place called Midkiff, some ten miles below Gill Station. From this point it

is about 17 miles to the land. The difference in distance of these two points from the land is very considerable, if it could be said, from the evidence, that it is practicable to reach the land with a branch road from Midkiff. The length of it would be almost double that of one from Gill Station. The first passenger train on the road went to Gill Station on second day of November, 1903, about ten months after the time specified in the contract for the completion of the road "opposite the land." After having considered all the evidence, we think it conclusively shows the road was not "completed and in operation" as far as Gill Station in the year 1902, nor prior to November, 1903, and that it was completed as far as Midkiff before January 1, 1903.

What was intended by the stipulation for the completion and operation of the railway opposite the land is to be ascertained, not by any arbitrary rule, or the technical meaning of the term "opposite." We must assume that both parties to the agreement entered into it in good faith. Therefore, their intention must be gathered from the instrument, considered as a whole, and as disclosing the circumstances under which they entered into it, their relative situation and the purposes each had in view. We are not to suppose that either, at that time, contemplated, expected or suspected any attempt on the part of the other to set up an arbitrary or technical signification of any term used. Each looked to, and was controlled by, the substance, rather than the form, of the contract. The advantages sought by the railway company were aid and assistance in the construction of its road. Those anticipated by the land owners were enhancement of the value of their land, to be conferred by the construction of the road in proximity thereto, and a means of marketing the coal to be taken therefrom, whether by themselves, their lessees or persons to whom they might desire to sell the land. These inducements to the agreement on both sides indicate more clearly and with greater certainty the intention of the parties than the signification of the word "opposite," as disclosed by the definition thereof found in the dictionaries. This gives it a more certain construction or meaning than it would be possible to arrive at, by adhering to the abstract definition; for unrestrained and unqualified by reference to any related object, it would be wholly

uncertain. In the unlimited sense of the term, one object is opposite another wherever it may be, in whatever direction and however distant. The terms of the contract bring the land and the railroad into relation with one another. Having the two things thus related, the word "opposite" in the strict sense thereof, would probably mean a point on the railroad opposite the center of the land, to be ascertained by a line drawn from the center of the tract so as to strike the railroad at right angles. But, as the railroad is as crooked as the river, this might mean a line drawn from a point on the road so as to mark the general course of the railroad. But are we to assume that only one opening on 3,100 acres of land was contemplated, and that the land owners were not to have a railroad running the whole length of the tract so as to enable them to open their mines at such points and at as many different points as should seem to them necessary or convenient? Possibly not, since it appears that the land was not accessible from the railroad in a practical sense from all points thereof. While we think this clause should be liberally interpreted as to the point to which it was intended the railroad should be completed and in operation, we are equally well satisfied that the interpretation should be reasonable. The condition was that the railroad should be completed and in operation to a point from which it would be practicable to reach the land, reasonably practicable, not merely possible; but it cannot be assumed that the railway company ever intended to build a branch line or spur to this land from a point on the main line, the construction of which, by reason of the distance and other disadvantages, would impose an investment or expenditure of money disproportionate to the advantages or income to be derived from the operation thereof or the traffic to be done over it. As Gill Station, the mouth of Big Ugly Creek, appears from the evidence to have been the point from which the coal in this land could be most conveniently and economically reached from the railroad, we conclude that the parties contemplated completion of the road to that point, at least by the first day of January, 1903, and that this was not accomplished.

Failure of the railway company to comply with the condition having been shown, the propriety of the remedy invoked by the plaintiff is dependent upon the character of that con-

dition. If it is a condition subsequent, non-compliance with which works a forfeiture of a vested right or estate, a court of equity will not enforce the forfeiture. It will leave the parties to their legal remedies. *Pheasant* v. *Hanna*, decided at the present term; *Spies* v. *Railroad Co.*, 60 W. Va. 389; *Railroad Co.* v. *Triadelphia*, 58 W. Va. 487; *Craig* v. *Hukill*, 37 W. Va. 520. If it is a condition precedent, one which it was incumbent upon the railway company to perform before any interest, right, title or estate vested or could vest, or, in other words, the performance of which operated to vest the title, or was the means by which the title was to be acquired, not defeated after aquisition in some other way, equity has jurisdiction to cancel the contract by way of removing a cloud from the title to the land, if it constitutes a cloud thereon, for this can be done without destroying any right under it. Cancellation under such circumstances does not enforce a forfeiture, since the time having passed within which the condition was to have been performed, no right ever can be acquired under it. *Starn* v. *Huffman*, 59 S. E. 179. That failure to perform a condition precedent prevents the vesting of title or right is elementary law. *In Re Brooklyn &c. Ry. Co.*, 72 N. Y. 245; In *Re Brooklyn &c. Ry. Co.*, 75 N. Y. 735; *Brooklyn &c. Ry. Co.* v. *City of Brooklyn*, 78 N. Y. 524; *Oakland R. R. Co.* v. *Oakland &c. R. R. Co.*, 45 Cal. 365; *Ft. Worth Ry. Co.* v. *Rosedale Ry. Co.*, 68 Tex. 169; *Railway Co.* v. *Railway Co.*, 48 Mich. 433; *Ward* v. *Sea Ins. Co.*, 7 Paige (N. Y,) 294; Matter of *Jackson Ins. Co.*, 4 Sanf. (N. Y.) 559. "A condition precedent doth get and gain the thing or estate made upon condition, by the performance of it." Jacob L. Dict., 8 Cyc. 558.

No authority need be cited for the proposition that the completion and operation of the railroad opposite the land is a condition precedent. To say otherwise would be tantamount to saying a purchaser may obtain a deed for land, or possession thereof, without paying the purchase money under a contract expressly providing that the terms of the purchase shall be cash, payable on delivery of the deed or before entry on the land. It could not be supposed for a moment that the parties intended an interest in the land should vest in the railway company except upon the building of the railroad. That was the substance of the thing which it was stipulated

the railway company should do.   It constituted the whole consideration for all the covenants and agreements made by the other parties.   This would necessarily be the conclusion if the terms of the contract did not indicate it, but they do. All the stipulations in favor of the railway company are clothed in prospective terms.   The parties of the first part agreed that they would lease or cause to be leased their land; that the royalty on leases should be equally divided; that the parties of the first part should have the right to mine the coal, and, if so, that they should pay to the party of the second part four cents per ton royalty; and that they should have rights of way and ground for switches, depot, tipples and other buildings.   There is no language in the contract importing a grant of any right *in praesenti*.   All the language relates to the future, and after it is placed the condition, saying that, if the railroad shall not be commenced in one year and completed and in operation opposite the property by the first day of January, 1903, the "agreement shall be no longer binding upon the parties hereto."   The only matter about which there could be a doubt is whether time is made an essential part of the condition.   In the construction of contracts, this is often a perplexing inquiry, but the doubt generally arises in those instances in which the parties have not, by any express term of the contract, indicated the essentiality of the time specified.   Then resort must be had to the nature of the instrument, its subject matter, the evident purpose had in view, the prior and subsequent conduct of the parties and the immediate context of the phrase or clause specifying time.   The form and legal effect of the stipulation also have important bearing upon the question.   In such cases, the inquiry is for the intention of the parties and it must be gathered from the whole instrument and the surrounding circumstances.   It is a case of ambiguity, calling for the application of principles governing the construction of ambiguous instruments.   "Conditions have no idiom.— Whether they be precedent or subsequent is a question purely of intent, and the intention must be determined by considering not only the words of the particular clause, but also the language of the whole contract as well as the nature of the act required, and the subject matter to which it relates."   8 Cyc. 558, note 20.   In *Glaholm* v. *Hays &*

*Others*, 2 M. *& G.* 257, a memorandum of a charter-party provided that the vessel should proceed to a certain port and there load a full cargo, and, being so loaded, should proceed to a port in the United Kingdom, and deliver the same upon payment of freight at a certain port; that a certain period should be allowed the merchants for loading at the port of shipment and unloading at the port of delivery; and that twelve days should be allowed for demurrage at a certain price per day. These stipulations were followed by the phrase "the vessel to sail from England on or before the 4th day of February, next." She did not sail until after that date, and the question was whether the parties intended to make sailing on that day an essential element of the contract. Chief Justice Tindel observed in the first place that the terms used imported a condition rather than a covenant. He then proceeded to analyze the contract from the standpoint of its subject matter to determine whether or not the general intention disclosed by the whole contract would be better effectuated by treating it as a condition precedent, non-compliance with which entirely relieved the party not in fault, or as a covenant, giving him only a right of action for damages for the breach thereof. His conclusion was that it was a condition precedent, although the contract did not say it should not be binding in case of failure to sail on or before the day named. *Behn* v. *Burness*, 3 B. & S. 751, gives another illustration of a similar contract in which the phrase, relating to a ship, "now in the port of Amsterdam," stated a condition precedent without any express stipulation that it should be deemed essential. In *Bettini* v. *Gye*, 1 Q. B. D. 183, in which it was held the time stipulated for a certain act was not essential, further illustrates the rules governing courts upon such an inquiry. In that case, Blackburn, Judge, quotes Baron Parke as having said the intention of the parties is "to be collected from the instrument and the circumstances legally admissible in evidence with reference to which it is to be construed," and that "one particular rule well acknowledged is, that where a covenant or agreement goes to part of the consideration on both sides, and may be compensated in damages, it is an independent covenant or contract." In that case, the stipulation violated was that of a singer to appear in London at least six days before the commencement

of his engagement to sing for the purpose of re-hearsals.
He did not do so and his employer refused to allow him to
sing at all and the action was against the employer. The
court came to the conclusion that the stipulation violated did
"not go to the root of the matter so as to require" them "to
consider it a condition precedent." It was a subsid-
iary and comparatively unimportant provision of the
contract. Moreover, in point of form, it was an express
covenant, saying "Mr. Bettini agrees to be in London with-
out fail at least six days before the commencement of his en-
gagement for the purpose of re-hearsals." Parsons on Con-
tracts, (8 Ed.) Vol. 1, 584, says this, concerning the rules for
determining whether a stipulation as to time is essential:
"Some confusion occasionally arises in discussing the ques-
tion in any given case, whether time is or is not of the es-
sence of the contract; but as a general thing, we think the
matter may be rendered clear by considering whether, in the
particular case, the time mentioned is or is not subordinate
to any other condition. If it is, then its observance is less
important, and it may be regarded as not of the essence of
the contract. If, on the other hand, it be a condition, and
not subordinate to any other condition of the contract, then,
since the parties have seen fit to give it this primary place
and controlling influence in their contract, courts must hold
it to be of the essence of the contract. Thus, in the case of
a sale on arrival, the goods to be delivered within a certain
time, if the question be whether the mention of a time of de-
livery imposes an absolute obligation to deliver by that time,
although the goods have not arrived, the answer is, that, as
the delivery depends, by the very terms of the contract, upon
the arrival, it is therefore subordinate to the arrival, and the
time limited for delivery cannot control the condition of ar-
rival, and cannot be so far of the essence of the contract as
to make the seller responsible for the non-delivery. But if
the goods arrive after the time of delivery has expired, and
the question be whether the vendor is then bound to deliver,
or the purchaser to receive, the answer is, that, as the ar-
rival has already taken place, there is no longer anything to
control the delivery but the specification of time; and as the
condition of time is no longer subordinate, it must be allowed
its full effect in determing the liability of the parties, and

thus be regarded as of the essence of the contract. Again, if the question be whether the mention of a time for shipment imposes an absolute obligation that the goods shall be shipped at that date, the answer is that there is no other obligation in the contract to which the time of shipment is subordinate, and therefore, since the parties have seen fit to embody it in the contract, time must in this case be regarded as of the essence of the contract."

So far, the rules stated and the instances mentioned pertain to contracts in which the parties have not used terms expressly purporting to make time an essential element. Under the practically unlimited right and power of parties to make such contracts as they see fit to make and bind themselves to such extent, and in such manner, as they please, they may make performance of any covenant or condition, however unimportant or trivial in character, a condition precedent. Though time of performance may be comparatively or really unimportant in a practical sense, they have the power to stipulate with one another that failure to observe it shall be fatal and put an end to the contract. They may make the entire transaction turn upon that as a condition precedent. In *Bettini* v. *Gye*, cited, Blackburn, Judge, said: "Parties may think some matter, apparently of very little importance, essential; and if they sufficiently express an intention to make the literal fulfillment of such a thing a condition precedent, it will be one: or they may think that the performance of some matter, apparently of essential importance and *prima facie* a condition precedent is not really vital, and may be compensated for in damages, and if they sufficiently express such an intention, it will not be a condition precedent." In the quotation from Parsons on Contracts, reference is made to the distinction between essentiality found by construction and essentiality made by express stipulation. It is also referred to in *Cosby* v. *Honaker*, 57 W. Va. 512. Authorities are there cited for the well settled proposition that, when time has not been made essential by the terms of the contract, the covenantee may, after default, make it essential by a demand for performance after a reasonable time, accompanied by notice that no further time will be allowed. And this is true of covenants merely to pay money, breach of which is compensable in damages, easily and certainly ascertainable, since

it is measured by the interest on the money. It may be suggested here that, in determining whether a stipulation as to time discloses intent to make it essential, the character of the thing to be done is important. If it be only to pay money it may be well assumed that no great injury could result from default, and, if it be something other than the payment of money, it must be presumed that the injury will be greater. Therefore, the courts naturally make a distinction founded upon the nature of the thing covenanted to be done or the condition specified; but, even when no greater injury than loss of the use of the money could result, it is competent for the parties to make payment thereof on the day a condition precedent. In doing so, the court simply recognizes the broad liberty of contract which the law allows, and, from considerations of public policy, it is never limited even by the legislature, unless supression or prevention of some evil practice renders it necessary to do so. In *Railroad Co.* v. *Triadelphia*, cited, we declared the binding force of stipulations, making comparatively, or apparently, trivial matters essential elements of a contract. There the condition was subsequent as to which the rule would be more liberal, if different at all, because non-performance works a forfeiture of a vested right.

The stipulation under consideration here relates to a condition, the non-performance of which may inflict injury not easily or readily susceptible of ascertainment or compensation. It is not like failure to pay money on a specified day. It is not a covenant for breach of which an action would lie. However great the resultant injury from the breach or failure, damages could not be recovered. No means are provided for compelling performance. In the event of failure to perform within the time stipulated, the gravity of the injury would depend upon the period of delay. Delay of one month, or six months, might not be serious, but, if such delay is permissible, why not a delay of one year, five years or ten years? How could the court fix a time within which the delay would be deemed innocuous, and beyond, fatal? It cannot make a contract for the parties. In view of the nature of the stipulation and the subject matter thereof, the parties saw fit to fix a time within which the condition should be performed, and then said, if it should not be performed

within that time, the agreement should no longer be binding upon them. How can we say that this did not signify intention to make the time specified an essential element of the condition? They have solemnly said in their written agreement, not only that the road should be completed and operated opposite the land, but also that it should be completed and operated by the first day of January, 1903, and that failure to comply within that time should put an end to the contract. In this final clause, the date of completion is referred to as well as the requirement of completion. It may be suggested that the building of a railroad is a large undertaking, involving the expenditure of immense sums of money, requiring long time for accomplishment and subject to unavoidable delays, but this company allowed itself two and a half years in which to complete the road, and neglected to stipulate for extension of time, in case of unavoidable interruption of the work. Why? Presumably because the time allowed was deemed amply sufficient. Our conclusion is that, by the express terms of the contract, time is made of the essence thereof. As the road was not built within that time, no title vested, nor can it ever vest under this contract, wherefore the agreement now amounts to nothing more than a cloud upon the title of the plaintiffs and the court should have cancelled it as such.

The right to cancellation at the instance of the plaintiffs is disputed on the ground of their having purchased the land after the execution of the contract, and three of them after the expiration of the time stipulated for the completion of the road. Their purchase, no matter when made, put them in the shoes of Miller, Biggs and Watts, and conferred upon them all the rights and powers their grantors had, respecting the land. No title had vested in the railway company when they purchased. Though they purchased with notice of the contract, they did so knowing the condition, upon the performance of which the vesting of title under it depended, had not been performed. Upon what principle they are estopped from clearing their title of a now worthless and dead contract we are unable to perceive.

Complaint is predicated on the overruling of the demurrer, because Miller, Biggs, Watts and Porter were not made parties. They no longer had any interest in the land or the

contract, and were not in any sense, necessary or proper parties.

The decree appealed from will be reversed and the contract canceled and annulled. Costs in this Court, as well as in the court below, are awarded to the appellants.

*Reversed.    Contract Cancelled.*